In the Matter of MARTIN H. VON HOLDEN, Respondent, v MARK D. CHAPMAN, Appellant.

Fourth Department, May 21, 1982

APPEARANCES OF COUNSEL

*Antonio Faga* for appellant.

*Robert Abrams*, Attorney-General (*Aniela Carl* of counsel), for respondent.

**OPINION OF THE COURT**

DENMAN, J.

Mark David Chapman is serving a sentence of 20 years to life in Attica Correctional Facility for the killing of John Lennon, the former Beatle. He appeals from an order at Special Term which authorized Martin Von Holden, the Director of the New York Psychiatric Center, where Chapman is temporarily in custody, to take all steps necessary to force-feed Chapman in order to sustain his life. Invoking a constitutional right to privacy and to freedom of expression, Chapman claims that such State intervention is an unwarranted invasion of those rights. Under the circumstances presented here, we hold that the obligation of the State to protect the health and welfare of persons in its

care and custody, its interest in the preservation of life, and its interest in maintaining rational and orderly procedures in its institutions, are countervailing considerations of such importance as to outweigh any claimed rights of appellant.

## BACKGROUND

On February 10, 1982 Chapman was transferred to the Psychiatric Center pursuant to subdivision 9 of section 402 of the Correction Law, upon the certification of two examining physicians that he was suffering from a mental illness which was likely to result in serious harm to himself. That certification resulted from his refusal to eat for several days prior to the transfer and his expressed intention to take his life by starvation. Von Holden applied to Special Term for an order authorizing him to feed Chapman intravenously or by means of a nasal gastric tube and a hearing on the petition was held on February 25, 1982, at which time Chapman had not eaten for 22 days. The only witness at the hearing was Dr. Daniel N. Uwah, Chapman's treating physician and psychiatrist. According to his testimony and to the affidavit of Von Holden, Chapman was competent; had frequently expressed an intention to commit suicide; was fully aware that his refusal to eat would result in death; had stated that he was attempting to draw attention to the starving children in the world; that although he was not in imminent danger of death, delay would run the risk of irreversible brain damage, blindness and ultimately death; that the point at which his condition would become irreversible could not be predicted with certainty; and that because this condition could deteriorate rapidly, immediate intervention was indicated in order to prevent death or irreversible brain damage. There was further evidence that Chapman's hunger strike had caused disruption in the procedures in his unit, resentment among other patients, and had resulted in other patients adopting the starvation technique in order to gain attention.

## RIGHT OF PRIVACY

Relying on a line of cases of which *Griswold v Connecticut* (381 US 479) is the wellspring, Chapman contends that he has a constitutional right of privacy derived from the

penumbra of the specific guarantees of the Bill of Rights, "formed by emanations from those guarantees that help give them life and substance" (*Griswold v Connecticut, supra,* p 484). Even overlooking the fact that Chapman's status as a prisoner severely delimits his constitutional privileges (*Price v Johnston,* 334 US 266; *Cooper v Lombard,* 64 AD2d 130, 134), it is self-evident that the right to privacy does not include the right to commit suicide. For, as has been repeatedly stated, "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U.S. 319, 325 (1937), are included in this guarantee of personal privacy" (*Roe v Wade,* 410 US 113, 152). To characterize a person's self-destructive acts as entitled to that constitutional protection would be ludicrous. On the contrary, the State has a duty to protect the health and welfare of those persons in its custody (*Estelle v Gamble,* 429 US 97, 103) and may be cast in civil damages for its failure to observe such duty (see, e.g., *Lee v Downs,* 641 F2d 1117; *Sconiers v Jarvis,* 458 F Supp 37; *Polkovitz v State of New York,* 87 AD2d 984; *Wilson v Sponable,* 81 AD2d 1, app dsmd 54 NY2d 834; *Gioia v State of New York,* 16 AD2d 354).

The fact that the State has a legitimate and compelling interest in preventing suicide is demonstrated by several statutes. A person may be involuntarily committed if he has a mental illness likely to result in serious harm to himself (Mental Hygiene Law, §§ 9.37, 9.39, 9.41). Aiding another to commit suicide is a felony (Penal Law, § 125.15, subd 3), as is promoting a suicide attempt (Penal Law, § 120.30). Conversely, a person is justified in using the physical force necessary to thwart a person who is about to commit suicide (Penal Law, § 35.10, subd 4). Subdivision 9 of section 402 and subdivision 3 of section 508 of the Correction Law provide procedures whereby an inmate may be transferred to a psychiatric hospital when it appears likely that he will cause serious harm to himself.

The preservation of life has a high social value in our culture and suicide is deemed "a grave public wrong" (*Stiles v Clifton Springs Sanitarium Co.,* 74 F Supp 907, 909; *Hundert v Commercial Travelers Mut. Acc. Assn. of Amer.,* 244 App Div 459). Even a perfunctory perusal of the

case law of our sister States indicates the universality of that principle. (*Superintendent of Belchertown State School v Saikewicz,* 373 Mass 728 [Massachusetts Supreme Court acknowledged an interest in preserving life and preventing suicide]; *State ex rel. Swann v Pack,* 527 SW2d 99, cert den 424 US 954 [Tennessee court said that attempted suicide was a grave public wrong adverse to the State's compelling interest in protecting life and promoting the life of its citizens]; *Wallace v State,* 232 Ind 700 [Indiana court announced suicide was against the law of God and man]; *Commonwealth v Root,* 191 Pa Super Ct 238, revd on other grounds 403 Pa 571 [the Pennsylvania court said that the policy of the law is to protect human life, including that of a person who wishes to destroy his own life]; *Wyckoff v Mutual Life Ins. Co. of N. Y.,* 173 Ore 592 [self-destruction ordinarily involves moral turpitude and is regarded as being wrong]; *John F. Kennedy Mem. Hosp. v Heston,* 58 NJ 576 [the State had an interest in preventing a suicide by a competent person].)

Our attention has been directed to four cases in which the issue of whether the right to privacy includes the right to commit suicide by starvation while in State custody has been specifically decided. *Matter of Clauso* (___ NJ Super ___ [Mercer County, No. L 33141-81, Feb., 1982]); *White v Bordenkircher* (286 SE2d 686 [W Va]) and *Boyce v Petrovsky* (US Dist Ct, WDMo, No. 81-3322-CV-S-WRC, Sept., 1981) all refused to recognize such right. *Zant v Prevatte* (248 Ga 832), however, finding that the prisoner was sane and rational, held that he should be permitted to starve to death if he so chose. The rationale seemed to be that because the prisoner was once under a death sentence, if he were still under that sentence (p 834) "the State would ask the court to allow it to keep him alive against his will so it could later kill him." The Georgia court relied on cases which, in our opinion, are clearly distinguishable as they involve the right to refuse radical surgery or similar medical treatment.

Like the Georgia court, Chapman invokes that theory, citing *Matter of Yetter* (62 Pa D & C 2d 619) and *Matter of Erickson v Dilgard* (44 Misc 2d 27) which hold that a

competent adult must be allowed to refuse extraordinary medical treatment which would prolong his life. That concept was most recently explored in *Matter of Storar* (52 NY2d 363) which affirmed the right of a competent adult to decline extraordinary medical procedures to prolong his life when he is suffering from a natural degenerative condition. The court there stated, however, "[t]he State has a legitimate interest in protecting the lives of its citizens. It may require that they submit to medical procedures in order to eliminate a health threat to the community (see, e.g., *Jacobson v Massachusetts,* 197 US 11). It may, by statute, prohibit them from engaging in specified activities, including medical procedures which are inherently hazardous to their lives (*Roe v Wade, supra,* pp 150, 154)" (52 NY2d, at p 377). In upholding the right of a competent adult to decline such treatment, the court noted that "[i]n other cases the State may be able to assert additional interests, such as, prevention of suicide or, perhaps, protection of minor children or dependents." (52 NY2d, at pp 377-378, n 6.)

Even superficial comparison of the right to decline medical treatment with the right to take one's life illustrates their essential dissimilarity and to argue that because the State has recognized the former it must permit the latter would be to engage in the most specious reasoning.

### FREEDOM OF EXPRESSION

As an alternative argument, Chapman urges that his fasting was not an attempt at suicide but rather symbolic speech entitled to the protection of the First Amendment. In that regard, he claims that he was attempting to draw public attention to the starving children of the world. Accepting that proposition for the sake of discussion, we need only remark that Chapman's status as a prisoner renders his First Amendment rights subject to the reasonable limitations necessary for the maintenance of order and discipline in a penal institution (*Shaffery v Winters,* 72 FRD 191, 194). Whereas a prisoner's right of expression may not be circumscribed to an extent greater than that required for the legitimate ends of prison security and administration (*Bell v Wolfish,* 441 US 520, 545-547; *Newkirk v Butler,* 364 F Supp 497, 501, mod on other grounds

499 F2d 1214, cert granted *sub nom. Preiser·v Newkirk,* 419 US 894, vacated on other grounds 422 US 395), those · legitimate interests clearly include the need to prevent a prisoner's suicide even if cloaked in the guise of First Amendment expression.

The order should be affirmed.

SIMONS, J. P., CALLAHAN, BOOMER and MOULE, JJ., concur.

Order unanimously affirmed, without costs.