580 A.2d 887

**COMMONWEALTH of Pennsylvania, DEPARTMENT OF PUBLIC WELFARE, FARVIEW STATE HOSPITAL, Petitioner,**

v.

**Joseph KALLINGER, Respondent.**

Commonwealth Court of Pennsylvania.

Heard July 18, 1990.

Decided Aug. 14, 1990.

Publication Ordered Sept. 10, 1990.

Thomas Blazusiak, with him, Howard Ulan, Asst. Counsel, and John A. Kane, Chief Counsel, for petitioner.

Jeffrey J. Wander, Honesdale, for respondent.

David Ferleger, Philadelphia, Guardian Ad Litem, for Joseph Kallinger.

PELLEGRINI, Judge.

The Commonwealth of Pennsylvania, Department of Public Welfare, (Department), Farview State Hospital (Farview), files this Request for Special Emergency Relief asking this Court for a Declaratory Judgment authorizing the involuntary administration of necessary nutrition and medi-

cal treatment in order to preserve the safety, health and life of Joseph Kallinger (Kallinger).

We are called upon to decide a sensitive matter which is without precedent in this Commonwealth. Joseph Kallinger wants to starve himself to death.[1] The Department, who has custody, wants to force him to involuntarily receive food through a nasogastric tube and other medical treatment. We must decide if the Department has such right.

The current dilemma developed after Kallinger was recently readmitted to Farview on May 17, 1990, from the State Correctional Institution at Huntingdon (Huntingdon).[2] On June 22, 1990, he stated, as a result of his vision of Christ in a toilet bowl telling him to join him, that he would refuse to eat or drink, and that he desires to "meet his maker." He has also refused treatment for an abscess on his foot. On June 30, 1990, Kallinger agreed to be transferred to Wayne Memorial Hospital in Wayne County, Pennsylvania, in order to have intravenous fluids, including antibiotics, administered to him. However, he continued in his refusal to accept nutrition and other medical treatment.

On July 3, 1990, the Department filed an action for Declaratory Relief in the Court of Common Pleas of Wayne County, seeking authority to provide necessary treatment, nutrition and hydration to Kallinger. On that day, the trial court entered a preliminary order permitting the Department to do so. However, on July 10, 1990, after holding a hearing on the matter, the trial court dissolved its preliminary order and determined that Kallinger was competent

1. Kallinger, a convicted murderer, is currently serving two consecutive life sentences consecutively with a thirty to eighty year sentence in Pennsylvania. He also must serve a life sentence and a forty-two to fifty-two year sentence in New Jersey. He also must serve other sentences which are too numerous to mention. Needless to say, Joseph Kallinger will spend the rest of his natural life behind bars.

2. Kallinger began serving his Pennsylvania sentences at Huntingdon following his convictions in 1976. However, in 1977, he was committed to Farview where he stayed for over ten years, until 1988. Since 1988, he was recommitted once for a short period of time and then returned to Huntingdon. This recent recommittment was his second since returning to Huntingdon. His current recommittment is scheduled to expire on August 17, 1990.

and could reject nutrition and hydration necessary to preserve his health, safety and life.

The Department filed a Petition For Review seeking Special Emergency Relief pursuant to the original jurisdiction of this Court, and seeking review of the trial court's Order pursuant to our appellate jurisdiction. Sections 761 and 762 of the Judicial Code, 42 Pa.C.S. §§ 761, 762.[3]

On July 13, 1990, this Court granted the Department's request for a preliminary injunction, ordering that Kallinger may be involuntarily administered medical treatment, nutrition and hydration, pending further adjudication. On July 18, 1990, following a hearing, a second Order was issued continuing the involuntary medication and feeding of Kallinger pending final adjudication of this matter.

The Department offered testimony and evidence that if Kallinger is allowed to starve to death, this would have major negative repercussions on the prison and mental health systems; that Kallinger's death would have adverse effects on other patients, their families and the staff of the mental hospital; and other patients may also "copy-cat" Kallinger's actions.

Kallinger contends that despite such adverse repercussions to the Commonwealth, he should be allowed to die if he so chooses. He argues that his right to privacy overrides any interests of the Commonwealth because the use of a nasogastric tube to feed him is an overly intrusive procedure which could last a number of years.

We note at the outset that Kallinger is committed to Farview, a mental hospital for the criminally insane. He suffers from a serious mental illness, diagnosed by Mokarram Jafri, M.D., as a Borderline Personality Disorder. (Notes of Testimony (N.T.), July 10, 1990, p. 35; July 18, 1990, pp. 27–29). However, he is competent in the sense that he fully understands his decision and realizes that

3. By order dated July 13, 1990, this Court directed that the Petition For Review shall be regarded as a Complaint In Equity directed to our original jurisdiction, and that the appeal from the trial court's Order shall be dismissed without prejudice.

death will result if he continues to refuse nutrition and medical treatment. (N.T. July 10, 1990, pp. 36, 70–71).

We also recognize that Kallinger, through this action, may be attempting to manipulate the system in order to stay at Farview rather than return to Huntingdon. His authorization of his attorneys to enter appearances on his behalf—one to say that he has the right to die, the other to say the state had an obligation to make him stay alive—is certainly part of that manipulation. Although Kallinger has in the past and is now manipulating the system in which he finds himself, if the Department is not allowed to involuntarily provide him with nutrition and medical care, we assume that Kallinger will indeed starve himself to death.

While Kallinger is sufficiently competent to make a decision to starve himself to death, this is not a "right to die" case in the usual sense. There has been much public debate and court activity over whether such a right exists and in what circumstances it exists, and these cases involve decisions made by enfranchised citizens or someone acting on their behalf, that their substantial rights of privacy allows them to make that decision. *See e.g., Cruzan v. Director, Missouri Department of Health,* —— U.S. ——, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Kallinger is a convict and any rights that he may have are extremely limited and severely restricted because of the unique nature and requirements of prison custody. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Price v. Johnston,* 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). What this case concerns is whether the Commonwealth's interest in an orderly administration of the prison system is paramount over any residual right of privacy that Kallinger has which would make it an invasion of privacy on the part of the Commonwealth to force feed him.

The narrow issue then presented to us is whether the Commonwealth has a right to force a competent prisoner within the Commonwealth's penal system to receive involun-

tary medical treatment and nutrition and hydration through a nasogastric feeding tube. To decide this issue, a balancing test is employed, balancing the Commonwealth's interests against the prisoner's remaining right to privacy. *Matthews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Kallinger argues that his right to privacy is superior to the interests of the Commonwealth, no matter what effect it may have on the prison system. He argues that as a prisoner, he did not give up his right to starve himself, citing the Supreme Court of Georgia decision in *Zant v. Prevatte,* 248 Ga. 832, 286 S.E.2d 715 (1982). In that case, the Georgia court held that a competent prisoner had a right to starve himself to death.

The court, in ruling that the state does not have the right to force medical treatment and food on a competent prisoner, stated:

> A prisoner does not relinquish his constitutional right to privacy because of his status as a prisoner. The state has no power to monitor this man's physical condition against his will; neither does it have the right to feed him to prevent his death from starvation if that is his wish.... The state can incarcerate one who has violated the law and, in certain circumstances, even take his life. But it has no right to destroy a person's will by frustrating his attempt to die if necessary to make a point.

*Zant,* 248 Ga. at 833–834, 286 S.E.2d at 716–717.

Kallinger further argues that the procedure for forcing nutrition and hydration into him is overly intrusive. The procedure which the Department has been and wishes to continue using is a nasogastric tube which is inserted through the nose into the stomach. This tube will remain in his body and will have to be frequently removed and replaced. Kallinger correctly points out that there are several risks involved in this procedure, including internal bleeding and possibly even death. (N.T. July 10, 1990, pp. 42–43, 56–57; July 18, 1990, p. 23).

■ While admitting that there are risks to Kallinger as a result of his forced feeding, the Commonwealth argues that its interest in prison security and discipline, the morale of medical and custodial staff, as well as the law of this Commonwealth, far outweigh any right of privacy that Kallinger may have. We agree.

The Commonwealth has an overwhelming interest in maintaining prison security, order and discipline. The Supreme Court has stated that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the detained constitutional rights of ... convicted prisoners." *Bell v. Wolfish*, 441 U.S. at 546, 99 S.Ct. at 1878. This lack of a reasonable expectation of privacy deprives the convicts of Fourth Amendment rights in their prison cells. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).

■ Prison officials are given a wide range of discretion in the promulgation and enforcement of rules to govern the prison community in order to maintain security, order and discipline. *Bell v. Wolfish; Jones v. North Carolina Prisoners' Union; Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). *U.S. ex rel. Silverman v. Commonwealth of Pennsylvania*, 527 F.Supp. 742 (W.D. Pa.1981), *aff'd Appeal of Silverman*, 707 F.2d 1395 (3rd Cir.1983). Individual freedoms may be curtailed whenever prison officials, in exercise of their informed discretion, reasonably conclude that their exercise possesses the likelihood of disrupting prison order or stability or otherwise interfering with the legitimate penological objectives of the prison environment. *St. Clair v. Cuyler*, 634 F.2d 109 (3rd Cir.1980), *rehearing denied* 643 F.2d 103 (3rd Cir.1980); *See also Bell v. Wolfish; Jones v. North Carolina Prisoners Union; Wilson v. Prasse*, 325 F.Supp. 9 (W.D.Pa.1971), *aff'd* 463 F.2d 109 (3rd Cir.1972).

Other jurisdictions confronted with the same situation have held that compelled nutrition and medical treatment is proper because of the strong state interest in orderly prison

administration outweighs any convict's residual rights. In *Von Holden v. Chapman*, 87 A.D.2d 66, 450 N.Y.S.2d 623 (1982), Mark David Chapman, serving a twenty year to life term for the murder of former Beatle John Lennon, attempted to starve himself to death while in a mental institution. The Supreme Court of New York, Appellate Division, in allowing involuntary feeding through a nasogastric tube, found that the legitimate interest in prison security and administration clearly included the right to prevent a prisoner's suicide.

In *Commissioner of Correction v. Myers*, 379 Mass. 255, 399 N.E.2d 452 (1979), the Massachusetts Supreme Court allowed forced hemadialysis to a prisoner suffering a kidney condition on the basis of maintaining prison order. The court stated that imprisonment imposed severe limitations on the prisoner's right to privacy and bodily integrity.

In the present case, the uncontradicted testimony shows that if Kallinger would be permitted to die, other patients at Farview would almost certainly copy the same tactic, manipulating the system to get a change of conditions, possibly resulting in their death. (N.T. July 10, 1990, pp. 13–14, 25–26, 49; July 18, 1990, pp. 16–17, 31). Allowing a prisoner to die will cause other patients to become angry and lose faith in the system and make treatment more difficult; it may even spawn rioting at Farview or from prisoners at Huntingdon or other state institutions. (N.T. July 10, 1990, pp. 13–14, 20, 26; July 18, 1990, pp. 17–20, 36). It is clear that allowing a prisoner to starve to death while in state custody would have an unpredictable negative effect on the security and order within the prison system.

■ Besides preserving order with the prison system, the Commonwealth has a strong interest in maintaining the health of prisoners in its custody. The obligation of the Commonwealth to provide for the health and safety of the inmates in their custody is derived from two very important interests: the preservation of human life and the prevention of suicide. The preservation of human life is of great interest to the state. *John F. Kennedy Memorial Hospital*

*v. Heston,* 58 N.J. 576, 279 A.2d 670 (1971). In *Commonwealth v. Root,* 191 Pa.Super. 238, 244, 156 A.2d 895, 900 (1959), *revd. on other grds.* 403 Pa. 571, 170 A.2d 310 (1961), the Pennsylvania Superior Court stated that "[t]he policy of the law is to protect human life, even the life of a person who wishes to destroy his own."

The Commonwealth has a duty under the Eighth Amendment to protect the health and welfare of those persons in its custody, *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), and may be cast in civil damages for its failure to observe such duty, *Simmons v. City of Philadelphia,* 728 F.Supp. 352 (E.D.Pa. 1990); *Lee v. Downs,* 641 F.2d 1117 (4th Cir.1981). Furthermore, the Commonwealth has a duty to "provid[e] appropriate medical treatment to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others." *Washington v. Harper,* 494 U.S. ——, ——, 110 S.Ct. 1028, 1030, 108 L.Ed.2d 178 (1990).

The United States Supreme Court in *Washington v. Harper* allowed the forced administration of antipsychotic drugs to a prisoner on the basis that the state's interest in providing appropriate medical treatment outweighed the inmate's liberty interest. The Supreme Court found that the state has not only an interest, but an "obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution." *Washington v. Harper,* 494 U.S. at ——, 110 S.Ct. at 1039.

Other courts have also considered the state's interest in the preservation of human life. In *State ex. rel. White v. Narick,* —— W.Va. ——, 292 S.E.2d 54 (1982), the West Virginia Supreme Court of Appeals allowed the force feeding of an inmate who had begun a hunger strike to protest conditions of his prison. The court found that "[a] state must preserve human life, a concern at the very core of civilization.... West Virginia's interest in preserving life is superior to [the prisoner's] personal privacy (severely

modified by his incarceration)." *Narick,* —— W.Va. at ——, 292 A.2d at 58. *See also Commissioner of Correction v. Myers* (forced hemadialysis treatment on prisoner suffering kidney condition based on preservation of life and maintaining prison order); *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977).

The Court in *Narick* criticized the Georgia Supreme Court's decision in *Zant* by stating:

> The Georgia court failed to consider compelling reasons for preserving life, not the least being civility. What sense does it make for a state to allow a prisoner to kill himself, urging as its justification his right-of-privacy right to refuse medical treatment for his voluntary debilitation; and yet preserve unto itself the right to kill him, the ultimate violation of his privacy right. We doubt that Georgia would allow him to raise his right of privacy against being put to death, as a defense against the death penalty!

*Narick,* —— W.Va. at ——, 292 S.E.2d at 57.

The second related state interest is the Commonwealth's duty to prevent suicide. "American law has always accorded the State the power to prevent, by force if necessary, suicide—including suicide by refusing to take appropriate measures necessary to preserve one's life." *Cruzan v. Director, Missouri Department of Health,* —— U.S. at ——, 110 S.Ct. at 2859, 111 L.Ed.2d 224 (1990). (Scalia, J. concurring).

■ Pennsylvania public policy strongly opposes the commission of suicide. *Commonwealth v. Root.* Pennsylvania law makes it a crime to aid or solicit another person to commit suicide. Crimes Code, 18 Pa.C.S. § 2505. A police officer also has the right to use force to prevent a suicide from occurring. 18 Pa.C.S. § 508(d)(1). By asking the Commonwealth to stand by and watch him die while it has custody and control over him, Kallinger is asking it to aid and abet his suicide.

The leading case in support of a state's duty to prevent suicide is *Von Holden v. Chapman.* The Supreme Court of New York, Appellate Division, in rejecting Chapman's right to privacy claim, held that "it is self-evident that the right of privacy does not include the right to commit suicide.... To characterize a person's self-destructive acts as entitled to Constitutional protection would be ludicrous." *Von Holden v. Chapman,* 87 A.D.2d at 67, 450 N.Y.S.2d at 625.

Since Kallinger is a patient at Farview, the Commonwealth's interest in maintaining the integrity of the medical and psychiatric professions is also of great importance. Several courts have held that the integrity of the medical profession is an interest which should be balanced against a person's privacy right to refuse medical treatment or nutrition. *Cruzan; Narick; Saikewicz.*

If Kallinger is allowed to starve himself to death, repercussions would be felt throughout the medical and psychiatric professions. (N.T. July 10, 1990, pp. 19–20, 24–25, 40; July 18, 1990, pp. 16–17). Dr. Jafri, Chief of Psychiatric Services at Farview, stated that Kallinger's death would "have a negative impact upon the staff [in] that we could not carry out a moral and ethical obligation of keeping a patient alive." (N.T. July 10, 1990, p. 41). Jack Wolford, M.D., Psychiatric Director for the Department, testified that "it would be devastating to the staff and the staff morale if they had to allow someone to cease living, virtually by their own hand, while under our care." (N.T. July 18, 1990, p. 10).

Furthermore, if he is allowed to die, other patients and their families would have serious doubts about whether the psychiatric staff is providing their patients with proper psychiatric treatment and medical care. (N.T. July 18, 1990, pp. 26–27, 40; July 18, 1990, pp. 19, 36). Dr. Jafri testified that his death "will not encourage the confidence of their patients in our ability to manage and take care their needs, as [well as] the moral confidence of the public." (N.T. July 10, 1990, p. 41). Dr. Wolford stated that the patients

"would lose trust in the system of care." (N.T. July 18, 1990, p. 17).

■ The Commonwealth of Pennsylvania has an overwhelming interest in the orderly administration of its prison system. The Commonwealth must maintain prison security, order and discipline. It must also fulfill its duty to provide proper medical care to the inmates, thus preserving life and preventing suicide. These vital interests, along with the need to preserve the integrity of the physicians and psychiatrists working within the penal system, clearly outweigh any diminished right to privacy held by Kallinger.

Accordingly, we order that Farview can and must continue to provide appropriate nutrition through a nasogastric tube and appropriate medical care to Joseph Kallinger so long as he continues to refuse nutrition and medical treatment. Kallinger shall remain committed to Farview until such time as the medical and psychiatric staff feel it's appropriate for him to return to a State Correctional Institution.

## ORDER

### No. 239 Misc. Dkt. 1990

AND NOW, this 14th day of August, 1990, it is ordered that the Commonwealth of Pennsylvania, Department of Public Welfare, Farview State Hospital, must provide appropriate nutrition through a nasogastric tube and appropriate medical care to Joseph Kallinger as long as he continues to refuse either. Joseph Kallinger's commitment to Farview State Hospital is extended indefinitely until such time that the medical and psychiatric staff determines that such feeding can be carried out at an appropriate State Correctional Institution.

## ORDER

AND NOW, this 10th day of September, 1990, it is ordered that the opinion filed August 14, 1990 shall be

designated OPINION rather than MEMORANDUM OPIN-
ION and that it shall be *reported.*