665 So.2d 1099 (1996)
Harry K. SINGLETARY As Secretary of the Florida Department of Corrections, et al., Appellant,
v.
Michael V. COSTELLO, Appellee.
No. 95-0774.
District Court of Appeal of Florida, Fourth District.
January 3, 1996.
*1101 Robert A. Butterworth, Attorney General, Tallahassee, Charles M. Fahlbusch and Amanda Wall, Assistant Attorneys General, Hollywood, for appellant.
William R. Amlong and Maria Kate Northrup of Amlong & Amlong, P.A., Fort Lauderdale, and Andrew H. Kayton, American Civil Liberties Union Foundation of Florida, Inc., Miami, for appellee.
GUNTHER, Chief Judge.
Appellants, Harry K. Singletary, as Secretary of the Florida Department of Corrections, Franklin H. Becker, Chester Lambdin and the Department of Corrections, defendants below (Appellants), appeal a temporary injunction enjoining them from providing any medical treatment, assistance, testing or procedure of any form or kind to or upon the appellee, Michael V. Costello (Costello). Because we determine Appellants failed to prove that compelling state interests outweighed Costello's privacy right, we affirm.
In 1969, Costello was sentenced to life imprisonment for first degree murder. On or about January 11, 1995, Costello filed a pro se complaint against Appellants for declaratory and injunctive relief. Costello alleged that he had been on a total fast since January 3, 1995 to object to and protest the actions of the Department of Corrections (DOC). Apparently, Costello was fasting to protest his punitive transfer from Polk Correction Institution to Martin Correctional Institution as well as to protest an allegedly false disciplinary report filed against a Chaplain in the Polk Correctional Institution. Accordingly, Costello sought a declaratory judgment permitting him to "continue his fast devoid of non-consensual medical intervention." Thus, Costello sought to enjoin and restrain Appellants from "imposing non-consensual medical intervention ... or hindering or interfering with [Costello's] fast."
Shortly thereafter, Costello filed a temporary injunction again seeking to enjoin Appellants from imposing non-consensual medical treatment during his fast. Appellants responded claiming that they possessed a compelling state interest in preserving life, preventing suicide, protecting innocent third parties, maintaining the integrity of the medical profession, preserving internal order and discipline, maintaining institutional security, and finally, the rehabilitation of prisoners. Therefore, Appellants requested the trial court to deny the motion for temporary injunction.
A two-day evidentiary hearing was held wherein Costello proceeded pro-se. At the hearing, only Dr. Becker and Costello testified. Initially, Dr. Becker testified that Costello was in an infirmary lockdown cell due to his self-declared hunger strike. According to Dr. Becker, Costello's weight had dropped from 189 pounds to 159 1/2 pounds in slightly over three months. Portentously, Dr. Becker testified that at the point he believed Costello to be in danger of imminent death, he would
have him sent to the emergency room, and have the Court Order there permitting non-consensual medical intervention; and have him tied down, strapped, and a tube placed into his nose, down into his stomach, and given nutriments through that.
According to the doctor, not intervening in such a circumstance would result in suicide.
*1102 Costello stated that he was maintaining a fast to protest the actions of the DOC for two reasons:
(1) The unjust and unfounded accusations that were lodged against Chaplain Hankins; and (2) The unjust transfers that were imposed on me, and which directly resulted in the imposition of burdens on my visitation rights; ... My fasting is a form of protest with the Department of Corrections, requesting that two wrongs be righted.
Costello further testified that he successfully conducted two previous hunger strikes to correct wrongs committed by the DOC. Finally, Costello realized that if he continued his hunger strike without medical intervention from Appellants, death was imminent.
Eventually, the trial court entered an order granting Costello's motion for temporary injunction. The trial court determined that Costello had a constitutional and fundamental right to refuse medical treatment and that Appellants failed to establish a compelling state interest to override the same. Therefore, the trial court ordered the following:
... the Defendants Harry K. Singletary and the Florida Department of Corrections, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with any of them, are hereby enjoined from:
1) providing any medical treatment, assistance, testing or procedure, of any form or kind, to or upon the Plaintiff without the specific consent of the Plaintiff; ... .
Thereafter, Appellants filed a timely notice of appeal seeking review of that part of the trial court's order dealing with non-consensual medical intervention. Subsequent to this filing, Costello voluntarily dismissed the declaratory action. According to Costello's notice, he terminated his fast on 3-6-95 in view of receipt of a letter from Chaplain Steve Hankins which expressed satisfaction with a review of the investigation complained of by [Costello], and who urged [Costello] to terminate his fast for scriptural reasons.[1]
A temporary injunction is an extraordinary remedy which should be granted sparingly and only after the movant has alleged and proven facts entitling the movant to relief. Hiles v. Auto Bahn Fed'n, Inc., 498 So.2d 997 (Fla. 4th DCA 1986). In order for a temporary injunction to be granted, a plaintiff must prove that:
(1) he will suffer irreparable harm unless the status quo is maintained; (2) he has no adequate remedy at law; (3) he has a clear legal right to the relief requested; and (4) a temporary injunction will serve the public interest.
South Fla. Limousines, Inc. v. Broward County Aviation Dep't, 512 So.2d 1059, 1061 (Fla. 4th DCA 1987). A trial court's ruling on a motion for an injunction arrives at the appellate court clothed in a presumption of correctness and will be reversed only upon a showing of a clear abuse of discretion. Id. at 1062; M.G.K. Partners v. Cavallo, 515 So.2d 368 (Fla. 4th DCA 1987).
Quite obviously, the instant case centers around whether Costello has the legal right to the injunctive relief requested. That is, whether Costello has the legal right, as a prisoner, to refuse medical treatment and intervention when the need for the treatment and intervention stems from a self-induced hunger strike. In order to resolve this issue, it is necessary to determine the breadth of an individual's right to refuse medical treatment.
Both the federal and Florida constitutions protect an individual's right to refuse medical care. In the seminal case of Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990), the United States Supreme Court determined that Missouri's clear and convincing evidentiary standard, before the termination of a life support system, did not interfere with a competent person's right to refuse medical treatment. More importantly, the Supreme Court concluded, after a thorough review of informed consent cases, that a competent person has a liberty interest under *1103 the Due Process Clause in refusing unwarranted medical treatment. 497 U.S. at 277, 110 S.Ct. at 2851, 111 L.Ed.2d at 241. The high court reasoned that the logical corollary to the doctrine of informed consent is the conclusion that the patient generally possesses the right not to consent. 497 U.S. at 270, 110 S.Ct. at 2847, 111 L.Ed.2d at 236. Thus, for the purposes of that case, the Supreme Court assumed that the United States Constitution would grant a competent person a constitutionally protected right to refuse life-saving hydration and nutrition. 497 U.S. at 279, 110 S.Ct. at 2852, 111 L.Ed.2d at 242.
Nevertheless, under the federalist system of government, states may place more rigorous restraints on governmental intrusions than those imposed by the federal constitution. Traylor v. State, 596 So.2d 957, 961 (Fla. 1992). As explained by the Florida Supreme Court, "in any given state, the federal Constitution thus represents the floor for basic freedoms; the state constitution, the ceiling." Id. at 962. Unlike the federal and most state constitutions, Florida has a specific provision regarding an individual's right to privacy. Article I, Section 23 of the Florida Constitution provides:
Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
This explicit constitutional right embraces more privacy interests and extends more protection that the right to privacy provided under the Due Process Clause of the federal constitution. In re T.W., 551 So.2d 1186, 1192 (Fla. 1989). As recognized by the supreme court,
[t]he citizens of Florida opted for more protection from governmental intrusion when they approved article I, section 23, of the Florida Constitution. This amendment is an independent, freestanding constitutional provision which declares the fundamental right to privacy. Article I, section 23, was intentionally phrased in strong terms. The drafters of the amendment rejected the use of the words "unreasonable" or "unwarranted" before the phrase "governmental intrusion" in order to make the privacy right as strong as possible. Since the people of this state exercised their prerogative and enacted an amendment to the Florida Constitution which expressly and succinctly provides for a strong right of privacy not found in the United States Constitution, it can only be concluded that the right is much broader in scope than that of the Federal Constitution.
Winfield v. Division of Pari-Mutuel Wagering, Dep't of Business Regulation, 477 So.2d 544, 548 (Fla. 1985).
Not surprisingly, this broad, explicit privacy right has been applied in medical decision-making cases. See Rasmussen v. South Fla. Blood Serv., 500 So.2d 533 (Fla. 1987) (society's interest in maintaining a strong volunteer blood donation system outweighed AIDS victim's right to subpoena names of blood donors); Public Health Trust of Dade County v. Wons, 541 So.2d 96 (Fla. 1989) (Jehovah Witness has fundamental right to refuse blood transfusion without which she may die). The leading case in Florida defining the right to medical decision-making is In re Browning, 568 So.2d 4 (Fla. 1990). Mrs. Browning was left in a vegetative state after suffering a stroke which destroyed the portion of her brain which controlled cognition. Browning, 568 So.2d at 8. The stroke left Browning in a noncommunicative state, existing only by virtue of fluid and nutrition supplied by a nasogastric tube. Id. at 9. Pursuant to a living will, Browning's guardian petitioned to terminate the nasogastric feeding. Id. at 8. The supreme court determined that the guardian could, without prior judicial approval, discontinue the nasogastric feeding in accordance with Browning's prior instructions. Id. at 17.
In discussing the right to privacy, the supreme court determined that article I, section 23 provided an explicit textual foundation for those privacy interests inherent in the concept of liberty. Id. at 10 (citing Rasmussen v. South Fla. Blood Serv., Inc., 500 So.2d 533, 536 (Fla. 1987)). The Browning court then determined

*1104 [w]e can conceive of few more personal or private decisions concerning one's body that one can make in the course of a lifetime ... [than] the decision of the terminally ill in their choice of whether to discontinue necessary medical treatment.
Id. (citing In re T.W., 551 So.2d 1186, 1192 (Fla. 1989)). Thus, the supreme court concluded
... a competent person has the constitutional right to choose or refuse medical treatment and that right extends to all relevant decisions concerning one's health. Courts overwhelmingly have held that a person may refuse or remove artificial lifesupport, whether supplying oxygen by a mechanical respirator or supplying food and water through a feeding tube. We agree and find no significant legal distinction between these artificial means of life support.
Id. at 11-12. In a footnote, the supreme court reinforced the all encompassing nature of this right by stating "[w]e see no reason to qualify that right on the basis of the denomination of a medical procedure as major or minor, ordinary or extraordinary, life-prolonging, life-maintaining, life-sustaining, or otherwise." Id. at 11, n. 6.
Based upon the expansive interpretation given to article I, section 23, it becomes evident that Costello, as a competent adult, had the right to refuse life-saving medical procedures. Costello was a competent adult who made a voluntary, conscious choice concerning his medical options. Costello, as a lucid adult, decided to forego any medical intervention should his hunger strike reach a point when such intervention was necessary. Accordingly, we preliminarily hold that such a determination falls within the broad scope attributable to Florida's privacy right.
Having concluded that Costello enjoys the right to make a conscious decision concerning his medical options, it is now necessary to determine whether his status as a prisoner vitiated this right. It is firmly established that lawful incarceration brings about the necessary withdrawals or limitations of many privileges and rights, a retraction justified by the considerations underlying the penal system. Price v. Johnston, 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). Accordingly, the state of Florida has the constitutional authority to deny basic civil rights, including the right to vote and to serve on a jury, to a person convicted of a felony. Calhoun v. Department of Health and Rehab. Servs., 500 So.2d 674 (Fla. 3d DCA 1987); § 944.292, Fla. Stat. (1993). However, a convicted prisoner does not forfeit all constitutional protections by reason of the conviction and confinement. O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).
Only one Florida case has alluded to a prisoner's right of privacy. In Metropolitan Dade County v. P.L. Dodge Foundations, Inc., 509 So.2d 1170 (Fla. 3d DCA 1987), the appellate court was confronted with a case involving a hospital's claim for payment for the treatment of a prison inmate. Apparently, a prisoner was transferred to Dodge Memorial Hospital for a psychiatric evaluation and treatment. Id. at 1171. Thereafter, the hospital sued and obtained a summary judgment against the county for the outstanding bill. Id. In reversing, the third district concluded that the prisoner remained liable unless it was first established that the prisoner-patient was indigent. Id. at 1175-76. Importantly, the third district preliminarily determined that "a prisoner, like any ordinary citizen, may not forcibly by given medical treatment without his express or implied consent." Id. at 1172.
In accord with the above opinion is a 1975 attorney general's opinion. In this opinion, the attorney general was faced with the following question:
May the Division of Corrections forcibly treat an inmate patient who has refused medical or surgical treatment deemed necessary to save the inmate's life?
Op.Att'y Gen.Fla. 75-28 (1975). The attorney general determined that although deprived of liberty, a prisoner retains all other rights of ordinary citizens except those expressly or by necessary implication taken away by law. Id. at 75-29. Thereafter, the opinion noted that an ordinary citizen may not be forcibly treated without his or her implied consent. Id. Thus, because there *1105 was no express authority to forcibly treat a prisoner, the attorney general concluded:
... it is my opinion that prisoners are governed by the same rule and may not be forcibly treated without consent, even though such treatment is necessary to save the prisoner's life.
Id.
Although section 944.35(1)(f)(2) allows the DOC to use force in administering medical treatment, we hold that a prisoner retains the fundamental right to privacy espoused by Article I, section 23 of the Florida Constitution. Accordingly, Costello possessed a fundamental right to refuse non-consensual medical treatment even though he was incarcerated.
Having established that Costello, as a prison inmate, enjoys a constitutionally protected fundamental right to refuse non-consensual medical intervention, it is now necessary to delineate and balance the various state interests. The state's obligation to assure a person's wishes regarding medical treatment must be respected and can only be overcome if the state has a compelling state interest great enough to override this constitutional right. In re Browning, 568 So.2d 4, 13-14 (Fla. 1990). Additionally, the means to carry out such a compelling state interest must be narrowly tailored in the least intrusive manner possible to safeguard the rights of the individual. Id. at 14.
The Florida Supreme Court has repeatedly identified four state interests which must be considered and balanced against an individual's right to refuse medical treatment:
1. the preservation of life;
2. the protection of innocent third parties;
3. the prevention of suicide; and
4. the maintenance of the ethical integrity of the medical profession.
In re Browning, 568 So.2d at 14. In addition, because Costello is a prison inmate, the state interest in the "preservation of internal order and discipline, the maintenance of institutional security, and the rehabilitation of prisoners" is implicated. Commissioner of Correction v. Myers, 379 Mass. 255, 399 N.E.2d 452, 457 (1979). As noted by the supreme court, these state interests
... are by no means a bright-line test, capable of resolving every dispute regarding the refusal of medical treatment. Rather, they are intended merely as factors to be considered while reaching the difficult decision of when a compelling state interest may override the basic constitutional right[s] of privacy... .
Public Health Trust of Dade County v. Wons, 541 So.2d 96, 97 (Fla. 1989).
Generally, the state interest in the preservation of life is considered the most significant. In re Browning, 568 So.2d 4, 14 (Fla. 1990). In discussing this particular interest, the supreme court distinguished between curable and terminable afflictions.
The state's interest in the preservation of life generally is considered the most significant state interest. However, "there is a substantial distinction in the State's insistence that human life be saved where the affliction if curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long and at what cost to the individual [his] [or her] life may be briefly extended." [citations omitted].
Id. at 14. While the interests in the prevention of suicide and the maintenance of institutional security are self-explanatory, the interest in the protection of innocent third parties arises when the refusal of medical treatment endangers public health or implicates the emotional or financial welfare of the patient's minor child. Thor v. Superior Court, 5 Cal.4th 725, 21 Cal. Rptr.2d 357, 855 P.2d 375 (1993). The last and least significant of the aforementioned state interests is the maintenance of ethical integrity of the medical profession. In re Browning, 568 So.2d 4, 14 (Fla. 1990). According to this court
[r]ecognition of the right to refuse necessary treatment in appropriate circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients or the State's interest in protecting the same.
Satz v. Perlmutter, 362 So.2d 160, 163 (Fla. 4th DCA 1978), approved, 379 So.2d 359 (Fla. *1106 1980) (quoting Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417, 426-27 (1977)).
Although the Florida judiciary has not been faced with a case wherein it was necessary to balance the various state interests against a prisoner's right to engage in a hunger strike, several foreign jurisdictions have expressly and explicitly considered the issue. In In re Caulk, 125 N.H. 226, 480 A.2d 93 (1984), the supreme court of New Hampshire determined that a prison inmate had no constitutional right to starve himself to death even though the decision to do so was made knowingly and voluntarily. In Caulk, the inmate did not make any demands during his hunger strike, but rather his course of conduct was aimed at achieving one goal, death. Caulk, 480 A.2d at 95. After noting that the inmate enjoys a constitutional right to privacy, the New Hampshire court concluded that the state interest in the maintenance of institutional security was implicated:
Within the State prison, the State's interests, among others, involve the preservation of internal order and discipline and the maintenance of institutional security. [citations omitted] ...
In addition to necessitating special treatment for himself, the defendant's actions have the potential of causing more widespread institutional problems. If the defendant is successful in evading the prison's control over his behavior, this may jeopardize prison discipline and tax prison resources. [citations omitted]. We agree with the State that prison officials will lose much of their ability to enforce institutional order if any inmate can shield himself from the administration's control and authority by announcing that he is on a starvation diet. Prisoners are not permitted to live in accordance with their own desires, nor may they be permitted to die on their own terms without adversely and impermissibly affecting the State's legitimate authority over inmates. [citations omitted].
Id. at 96.
The New Hampshire high court also found the state interest in the prevention of suicide implicated.
Although the defendant contends that he is allowing himself to die, rather than committing suicide, it is important to note what this case does not involve. This is not a situation where an individual, facing death from a terminal illness, chooses to avoid extraordinary and heroic measures to prolong his life, albeit for a short duration. Rather, the defendant has set the death-producing agent in motion with the specific intent of causing his own death [citations omitted], and any comparison of the two situations is superficial.
Id. at 97. Accordingly, the Caulk court concluded that the state's interests in preserving life, preventing suicide and maintaining an effective criminal justice system outweighed the prisoner's right to privacy. Id.; see also Von Holden v. Chapman, 87 A.D.2d 66, 450 N.Y.S.2d 623 (1982) (utilizing the preservation of life and prevention of suicide, coupled with evidence that hunger strike disrupted prison order, to determine prison inmate did not have right to starve himself to death).
Similarly, in Department of Public Welfare, Farview State Hospital v. Kallinger, 134 Pa.Cmwlth. 415, 580 A.2d 887 (1990), appeal dismissed, 532 Pa. 292, 615 A.2d 730 (Pa. 1992), the Pennsylvania judiciary determined that an inmate did not have the right to starve himself to death. In Kallinger, the inmate commenced a hunger strike after a vision of Christ appeared in a toilet bowl telling the prisoner to join him. Id., 580 A.2d at 888. After delineating the inmate's right to privacy, the Pennsylvania court discussed the interest in maintaining prison security.
The Commonwealth has an overwhelming interest in maintaining prison security, order and discipline . ..
Prison officials are given a wide range of discretion in the promulgation and enforcement of rules to govern the prison community in order to maintain security, order and discipline [citation omitted] . ..
In the present case, the uncontroverted testimony shows that if Kallinger would be permitted to die, other patients at Fairview *1107 would almost certainly copy the same tactic, manipulating the system to get a change of conditions, possibly resulting in their death ... Allowing a prisoner to die will cause other patients to become angry and lose faith in the system and make treatment more difficult; it may even spawn rioting at Fairview or from prisoners at Huntingdon or other state institutions ... It is clear that allowing a prisoner to starve to death while in state custody would have an unpredictable negative effect on the security and order within the prison system.
Id. at 890-91.
In addition to the state interest in maintaining order within the prison system, the Pennsylvania court determined that the interests in the preservation of human life and the prevention of suicide were implicated. Id. at 891-92. Finally, the Kallinger court concluded that the integrity of the medical profession must be factored into the balancing equation. Id., 580 A.2d at 892. Thus, the Pennsylvania court concluded:
The Commonwealth of Pennsylvania has an overwhelming interest in the orderly administration of its prison system. The Commonwealth must maintain prison security, order and discipline. It must also fulfill its duty to provide proper medical care to the inmates, thus preserving life and preventing suicide. These vital interests, along with the need to preserve the integrity of the physicians and psychiatrists working within the penal system, clearly outweigh any diminished right to privacy held by Kallinger.
Id. at 893.
Federal decisions seems to be in accord with the above cases. In In re Sanchez, 577 F. Supp. 7 (S.D.N.Y. 1983), the New York district court granted the state's application to force feed a contemnor on a hunger strike. Apparently, the contemnor began a hunger strike to demonstrate his sincerity of his position that his continued imprisonment would have no effect upon his unwillingness to testify. Id. at 8. Although the court noted that a prisoner on a hunger strike, weakened to the point of physical incapacity, did not present a threat to prison security, the court stressed the fact that federal regulations provided for forced medical treatment if it is determined that the inmate's life or permanent health would be threatened if treatment is not initiated immediately. Id.; see also 28 C.F.R. § 549.65(a) (1993). After outlining the contemnor's right to privacy, the district court concluded:
[u]nder the special circumstances of this case, the Government's application must be granted. Mr. Sanchez is not on a hunger strike as a means of demonstrating on behalf of some political cause or religious belief... Nor is his situation analogous to a patient refusing life prolonging treatment. Rather, Sanchez is, by his own admission, attempting to bring maximum pressure to bear upon the Judge who will ultimately rule upon his motion to vacate the contempt order. Moreover, the prolongation of this hunger strike will soon render Mr. Sanchez physically or mentally incapable of testifying before the grand jury, thereby rendering further coercive sanctions futile. In one sense, therefore, Mr. Sanchez is attempting to escape from prison and to frustrate the lawful authority of the courts. This is a purpose that we cannot condone.
Id. at 9.
In contrast to the above cases is the Georgia case of Zant v. Prevatte, 248 Ga. 832, 286 S.E.2d 715 (1982). In Zant, the inmate, when sane and rational, decided to engage in a hunger strike to get the attention of the prison officials. Id., 286 S.E.2d at 716. The lower court in Zant determined that the state had no right to interfere with the inmate's hunger strike:
The State has no right to monitor this man's physical condition against his will; neither does it have the right to feed him to prevent his death from starvation if that is his wish ... The State can incarcerate one who has violated the law and, in certain circumstances, even take his life. But it has no right to destroy a person's will by frustrating his attempt to die if necessary to make a point.
Id., 286 S.E.2d at 716-17. The Georgia supreme court affirmed the lower court's decision disallowing state interference stating:

*1108 Prevatte is not mentally incompetent, nor does he have dependents who rely on him for a means of livelihood. The issue of religious freedom is not present. Under this circumstances, we hold that Prevatte, by virtue of his right to privacy, can refuse to allow intrusions on his person, even though calculated to preserve his life. The State has not shown such a compelling state interest in preserving Prevatte's life, as would override his right to refuse medical treatment.
Id. at 717.
Similar to Zant and more recent is the California case of Thor v. Superior Court, 5 Cal.4th 725, 21 Cal. Rptr.2d 357, 855 P.2d 375 (1993). In Thor, because a quadriplegic inmate intermittently refused to be fed, a prison doctor petitioned the trial court for an order allowing him to use a gastrojejunostomy or percutaneous gastrostomy tube to feed and medicate the inmate. Id., 21 Cal. Rptr.2d at 361, 855 P.2d at 379. After thoroughly discussing the right "to be left alone," the California supreme court concluded, as a general proposition
that a physician has no duty to treat an individual who declines medical intervention after "reasonable disclosure of the available choices with respect to proposed therapy (including non-treatment) and of the dangers inherently and potentially involved in each." [citations omitted]. The competent adult patient's "informed refusal" supersedes and discharges the obligation to render further treatment.
Id., 21 Cal. Rptr.2d at 365, 855 P.2d at 383.
Thereafter, the Thor court discussed, and ultimately subrogated the various state interests to the privacy right of the individual. With regard to the preservation of life, the high court quoted Justice Brennan from his dissenting opinion in Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990):
Thus, "(w)hile both of the() state interests in life are certainly strong, in themselves they will usually not foreclose a competent person from declining life-sustaining medical treatment... . This is because the life that the state is seeking to protect in such a situation is the life of the same person who has competently decided to forego the medical intervention; it is not some other actual or potential life that cannot adequate protect itself." [citations omitted].
Id., 21 Cal. Rptr.2d at 366, 855 P.2d at 384. Subsequently, the Thor court dismissed the state interest in the prevention of suicide because no state interest is compromised by allowing an individual to experience a dignified death rather than an excruciatingly painful life. Id., 21 Cal. Rptr.2d at 367, 855 P.2d at 385 (quoting Donaldson v. Lungren, 2 Cal. App.4th 1614, 4 Cal. Rptr.2d 59, 63 (1992)). Thereafter, the court found inapplicable the state interest in the protection of innocent third parties because the inmate was childless. Id., 21 Cal. Rptr.2d at 369, 855 P.2d at 387.
The Thor court then proceeded to discuss the privacy right in light of Andrews' status as a prisoner. After recognizing that incarceration necessarily limits an individual's freedom, the California high court focused on the specific facts adduced in the case.
In refusing to consent to further treatment, Andrews is exercising his fundamental right of self-determination in medical decisions. Petitioner has offered no evidence that allowing him to do so undermines prison integrity or endangers the public. [footnote omitted]. Thus, considering the magnitude of the right at issue ... we hold that petitioner must accede to Andrews' decision and may not force him to accept unwanted treatment. [citations omitted].
We are not unmindful of the difficulties involved in maintaining an orderly and secure penal institution; and our holding does not imply any attenuation of the deference accorded the experience and expertise of administrative officials in such matters. [citations omitted]. In another case, or in this case if a change of circumstances warrant, we do not preclude prison authorities from establishing the need to override an inmate's choice to decline medical intervention. [citations omitted]. A custodial environment is uniquely susceptible to the catalytic effect of disruptive conduct; and courts will not interfere with reasonable measures required to forestall such untoward *1109 consequences. [citations omitted]. However, such measures must be demonstrably "reasonable" and "necessary," not a matter of conjecture.
Id., 21 Cal. Rptr.2d at 370, 855 P.2d at 388. Therefore, in analyzing the facts adduced in the particular case, the Thor court concluded that the record substantiated no countervailing state interest sufficient to override Andrews' right to self-determination. Id., 21 Cal. Rptr.2d at 372, 855 P.2d at 390.
Turning to the instant case, quite obviously, the state interest in the preservation of life, the most significant interest, is implicated. Importantly, as noted in In re Browning, 568 So.2d 4 (Fla. 1990), Costello's condition was curable rather than a terminal affliction. However, although the state interest in the preservation of life is powerful, in and of itself, it will not foreclose a competent person from declining life-sustaining medical treatment. Thor v. Superior Court, 5 Cal.4th 725, 21 Cal. Rptr.2d 357, 366, 855 P.2d 375, 384 (Cal. 1993). This is because the life that the state is seeking to protect is the life of the same person who has competently decided to forego the medical intervention. Id. The cases utilizing this interest to deny the continuation of a hunger strike have also discussed and found additional state interests implicated. Thus, considering the breadth of Florida's privacy right, the state's interest in the preservation of life, in and of itself, cannot overcome Costello's fundamental right to forego life-sustaining medical intervention.
Although Costello "set the death producing agent in motion" by engaging in a hunger strike, the state interest in the prevention of suicide is truly not implicated in the instant case. In the cases relying upon the prevention of suicide interest, the inmate actually desired the hunger strike to produce death. In re Caulk, 125 N.H. 226, 480 A.2d 93 (1984); Von Holden v. Chapman, 87 A.D.2d 66, 450 N.Y.S.2d 623 (1982). In the instant case, however, Costello testified that he did not want to die. Costello commenced his hunger strike as a form of protest, with the resolution of his complaints as the desired end. Thus, the purpose of the hunger strike was to bring about change, not death. Therefore, the state interest in the prevention of suicide is not implicated in the instant case.
The interest in the protection of innocent third parties is inapplicable in the instant case. This concern arises when the refusal of medical treatment endangers the public health or implicates the emotional or financial welfare of the patient's minor children. Satz v. Perlmutter, 362 So.2d 160, 162 (Fla. 4th DCA 1978), approved, 379 So.2d 359 (Fla. 1980); Thor v. Superior Court, 5 Cal.4th 725, 21 Cal. Rptr.2d 357, 371, 855 P.2d 375, 389 (Cal. 1993). The death of a prison inmate serving a life sentence in no way endangers the public health. Additionally, there was no evidence of minor children depending emotionally or financially on Costello. Accordingly, the interest in the protection of innocent third parties is not implicated.
Likewise, no evidence was adduced in the instant case regarding the maintenance of ethical integrity of the medical profession. Moreover, as noted by the California supreme court, patient autonomy and medical ethics are not reciprocals; one does not come at the expense of the other. Thor v. Superior Court, 5 Cal.4th 725, 21 Cal. Rptr.2d 357, 368, 855 P.2d 375, 386 (1993). Rather, the latter is a necessary component and complement of the former and should serve to enhance rather than constrict the individual's ability to resolve a medical decision. Id. Thus, there is no threat to the interest in maintaining the ethical integrity of the medical profession, the least significant state interest, in upholding Costello's intelligent and conscious decision to forego medical intervention.
Lastly, because Costello is a prison inmate, the interest in maintaining an orderly and secure penal institution must be considered. In the instant case, however, the Appellants adduced no evidence that Costello's actions undermined the security, safety or welfare within the prison. There was no testimony that Costello has in any way caused a disruption or has posed as a security risk to the Martin County Correctional Institution. In the cases relying on this interest to deny the continuation of a hunger strike, evidence was present concerning the effect of the inmate's conduct upon the prison. See Department of *1110 Pub. Welfare, Farview State Hosp. v. Kallinger, 134 Pa.Cmwlth. 415, 580 A.2d 887 (1990), appeal dismissed, 532 Pa. 292, 615 A.2d 730 (1992); In re Caulk, 125 N.H. 226, 480 A.2d 93 (1984); Von Holden v. Chapman, 87 A.D.2d 66, 450 N.Y.S.2d 623 (1982). Obviously, a prison environment is uniquely susceptible to the "catalytic effect of disruptive conduct." Thor v. Superior Court, 5 Cal.4th 725, 21 Cal. Rptr.2d 357, 370, 855 P.2d 375, 388 (1993). However, in the instant case, arguments concerning the effect of Costello's conduct are nothing more than speculation and conjecture. See Id.
Thus, in the instant case, Costello's privacy right to refuse medical intervention must be balanced against only the state interest in the preservation of life. This interest, in and of itself, cannot overcome the fundamental nature of Costello's privacy right. As such, the trial court did not err in determining that Costello, as a prison inmate, had the legal right to refuse medical treatment where the need for the treatment stemmed from a self-induced hunger strike. Accordingly, the trial court did not abuse its discretion in enjoining Appellants from providing Costello with any medical treatment or assistance while Costello engaged in a hunger strike.
Our resolution of this case should not be interpreted as universally holding that a prison inmate has the right to starve to death. Simply, under the facts of the instant case, the countervailing state interests did not overcome Costello's privacy right to refuse medical intervention. In another case, or with different evidence presented below, a different result may be reached. As previously mentioned, the various state interests to be considered
... are by no means a bright-line test, capable of resolving every dispute regarding the refusal of medical treatment. Rather, they are intended merely as factors to be considered while reaching the difficult decision of when a compelling state interest may override the basic constitutional right[s] of privacy... .
Public Health Trust of Dade County v. Wons, 541 So.2d 96, 97 (Fla. 1989). In the instant case, under the evidence adduced, the state interests did not override Costello's constitutional right of privacy.
AFFIRMED.
FARMER, J., and HENNING, PATTI ENGLANDER, Associate Judge, concur.
NOTES
[1] Although no actual case is in controversy, we hereby exercise our inherent jurisdiction to decide this issue of great public importance that is capable of repetition while evading effective review. Holly v. Auld, 450 So.2d 217 (Fla. 1984); Fey v. Curtis, 624 So.2d 770 (Fla. 4th DCA 1993).