Debra D. Witherell, : 
                Petitioner : 
                 : 
          v. : 
                 : 
Unemployment Compensation : 
Board of Review, : No. 808 C.D. 2015
          Respondent : Submitted: December 31, 2015


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE MARY HANNAH LEAVITT, Judge[1]
                HONORABLE ANNE E. COVEY, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                    FILED: May 12, 2016


      Debra D. Witherell (Claimant) petitions this Court for review of the Unemployment Compensation (UC) Board of Review's (UCBR) April 23, 2015 order affirming the Referee's decision denying Claimant UC benefits under Section 402(e) of the UC Law (Law).[2] Claimant presents five issues for this Court's review: (1) whether the UCBR's finding that Claimant "admitted to making unauthorized [photo]copies of photographs for the inmates, which she knew might be used for tattooing purposes," is supported by substantial evidence;[3] (2) whether the UCBR erred in determining that Claimant's actions constituted willful misconduct rather than negligence; (3) whether the UCBR erred in determining that the Pennsylvania

---

[1] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

[2] Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e) (referring to willful misconduct).

[3] Original Record Item No. 17, UCBR April 23, 2015 Decision and Order at 2.

Department of Corrections (Department) met its burden of proving that Claimant deliberately violated a work rule; (4) whether substantial evidence supports the UCBR's determination that Claimant's photocopying for inmates was the actual cause for her dismissal; and, (5) whether the UCBR erred when it denied Claimant UC benefits for the 76 days of her suspension, based not on the reason for her suspension, but on a reason for her subsequent dismissal. After review, we affirm.

Claimant was employed as a Corrections Officer II with the Department from June 10, 2002 through May 13, 2014. Claimant received a copy of the Department's Code of Ethics and also received training for her position. The Code of Ethics included the following relevant provisions:

**Code of Ethics A2**

No [D]epartment employee shall engage directly or indirectly in any personal business transaction or private arrangements for personal profit which accrues from or is based upon his/her official position or authority. The scope of this provision shall include prohibition against entering into any type of business transaction or private arrangements with inmates. . . .

**Code of Ethics A4**

Employees and their families shall not directly or indirectly solicit, accept, or agree to accept any gift of money or goods, loans or services for personal benefit which would influence the performance of their work duties or decision making. Correctional employees shall not accept or perform favors or accept or distribute any gifts, money, or loans to or from inmates or members of an inmate's family.

**Code of Ethics B6**

There shall be no fraternization or private relationship of staff with inmates or members of their families. This includes, but is not limited to, trading, bartering or receiving gifts, money and favors from either the inmate or the inmate's friends, relatives, or representatives. Moreover,

2

employees are not to deliver gifts or money to inmates' friends, relatives or representatives.

**Code of Ethics B10**

Employees are expected to treat their peers, supervisors, and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

Original Record (O.R.) Item No. 9, Department's July 28, 2014 Letter.

On February 13, 2014, Gregory Holler (Holler), a criminal investigator with the Office of Special Investigations and Intelligence, received a request to investigate allegations made by an inmate that Claimant was involved in a sexual relationship with an inmate. The Department conducted a pre-disciplinary conference with Claimant on April 4, 2014. At a "Suspension Pending" meeting Claimant attended on May 14, 2014, allegations concerning Claimant's conduct were discussed, including: that Claimant engaged in sexual contact with an inmate; that Claimant "[m]ade unauthorized photocopies, some of tattoos used by inmates to make tat[t]oos[;]" that Claimant "[p]ermitted and condoned homosexual relationship/contact between inmates[;]" and, that Claimant "[a]ccepted gifts of food in exchange for permitting homosexual relations between inmates." O.R. Item No. 3, Suspension Pending. The next day, the Department suspended Claimant pending completion of its investigation. The Department memorialized Claimant's suspension by May 27, 2014 letter, which explained that it confirmed "verbal notification" of Claimant's May 15, 2014 suspension and provided, "[the] suspension is pending completion of [the Department's] investigation into charges of an unauthorized relationship between [Claimant] and an inmate." O.R. Item No. 3, May 27, 2014 Revised Letter. The letter also stated: "On May 14, 2014, you were afforded the opportunity to provide a statement and/or furnish your version of the

3

charges.  You declined that opportunity. . . .  **Due to the charges filed against you,[4] your removal from the work place is warranted pending further investigation.**"
*Id*. (emphasis added).

Claimant applied for UC benefits.  On June 5, 2014, the Erie UC Service Center issued a notice of determination finding Claimant eligible for benefits.  On June 20, 2014, the Department appealed from the determination.[5]

Evidence discovered during Holler's investigation led him to conclude that Claimant allowed inmates to engage in sexual activities in exchange for food, and she had done favors for inmates by making photocopies of photographs from tattoo magazines.

On June 9, 2014, the Department held a second pre-disciplinary conference (PDC) with Claimant before a three-member management panel (Panel), which included Sandra Diehl, the Department's Human Resource Officer.  The PDC minutes (PDC Minutes) contained a fact-finding overview, which specifically described Holler's interviews of inmates, co-workers and Claimant:

> [Claimant] confirmed that she made unauthorized [photo]copies, utilizing the copier in the counselor's office, of photographs from magazines.  [Claimant] admitted she knew the photographs were used for tattooing purposes.
>
> [Claimant] confirmed she hid food items in the ceiling of the A Block bubble. She stated some of the items were coffee and related supplies.  She stated this was to prevent other shifts from using her items.

O.R. Item No. 9, PDC Minutes at 3.  Concerning Claimant's acceptance of gifts from inmates, the fact-finding revealed:

---

[4] Notably, the charges presented at the May 14, 2014 meeting (referenced in the May 27, 2014 Revised Letter) included more than just the alleged unauthorized relationship, and expressly included the charge that Claimant "[m]ade unauthorized photocopies, some of tattoos used by inmates to make tat[t]oos."  O.R. Item No. 3, Suspension Pending.

[5] A Referee hearing was not held until January 5, 2015.

4

[Claimant] admitted she accepted food items such as chips and sandwiches from Inmate Jose. She explained Inmate Jose would bring the food items back with him after he had finished his shift in the kitchen. [Claimant] denied she stored those items in the ceiling; she said she ate them immediately.

. . . .

[Claimant] admitted she accepted food items such as chips from Inmate Stewart, which he purchased at the commissary, in exchange for allowing Inmate Stewart's homosexual lover Inmate Smith-Bey to visit Inmate Stewart's cell. [Claimant] stated she was aware that Inmate Stewart and Inmate Smith-Bey were lovers and assumed they were engaging in sexual acts while in Inmate Stewart's cell. However, she claimed she did not witness the sexual acts directly.

When interviewed by [Holler] . . . Inmate Stewart admitted he and Inmate Smith-Bey were homosexual lovers and engaged in sexual conduct in his cell. Inmate Stewart confirmed he provided [Claimant] with chips and popcorn from the commissary in exchange for allowing Inmate Smith-Bey in his cell to engage in sex. Inmate Stewart stated [Claimant] was well aware of him and Inmate Smith-Bey engaging in sex.

When interviewed by [Holler] . . . Inmate Smith-Bey confirmed that he and Inmate Stewart were homosexual lovers and engaged in sexual conduct inside of Inmate Stewart's cell. Inmate Smith-Bey confirmed that [Claimant] would give him permission to visit Inmate Stewart's cell even during count. Inmate Smith-Bey stated [Claimant] was aware of him and Inmate Stewart engaging in sexual conduct. Inmate Smith-Bey confirmed that Inmate Stewart provided [Claimant] with something which allowed him to visit.

. . . .

This investigation found the allegations about [Claimant] engaging in sexual misconduct with Inmate Johnson were unsubstantiated. . . . However, this investigation substantiated that [Claimant] violated the Code of Ethics . . . by her own admissions of accepting gifts and favors from

5

[i]nmates and for condoning sexual contact between two inmates.

O.R. Item No. 9, PDC Minutes at 3-4.

The PDC Minutes also included Claimant's responses to the Panel's questions that directly contradicted portions of the fact-finding as follows:

> Panel: . . . [B]ased on your own statement you allowed Inmate Stewart to have his lover in the cell.
>
> [Claimant]: Inmate Stewart has a lot of issues. He was removed from the block for threats, then he came back and we have had a lot of problems with him. He would be in the dayroom and would get upset and start crying and I didn't want him to get picked on so I would send him to his cell and would allow Inmate Smith-Bey to go with him because I knew he was the one person who could calm him down. They were never allowed to have sex. After about 5 minutes[,] I would go back and check on them.
>
> Panel: Is Inmate Smith-Bey assigned to the same cell?
>
> [Claimant]: No.
>
> Panel: You wrote in your statement that you knew they were lovers, why would you not write the explanation you just gave us in your statement?
>
> [Claimant]: I was to keep it short and simple. He has a lot of issues and when I addressed it, I was told to make it work. At no time did I condone or authorize sex.
>
> Panel: Did you make [photo]copies of pictures for tattoos?
>
> [Claimant]: I made [photo]copies [out of] tattoo magazines so they could draw. It was not a wise decision but I did it.
>
> . . . .
>
> Panel: Inmate Stewart says he gave you chips so you would allow his lover into his cell, you never mentioned to Staff that he was giving you chips?
>
> [Claimant]: I was in counselor's office and he walked by and when I looked[,] there was a bag with chips in it but I

6

never asked him for it. Another time he slid a candy bar through the slot in the bubble. I told him that he had to stop and he did.

Panel: Did you return it?

[Claimant]: No.

Panel: What about the sandwiches with Inmate Jose?

[Claimant]: I would sometimes bring sandwiches back from the chow hall for staff and occasionally when I had some leftover I would give Inmate Jose a sandwich.

Panel: You were aware of a relationship between Inmate Stewart and Inmate Smith-Bey, please explain why you let him go into Inmate Stewart's cell?

[Claimant]: As I said before, he was the one guy who could talk to him. He knew how to get through to him. He was never in his cell for a length of time that would enable them to have sex.

O.R. Item No. 9, PDC Minutes at 5-6. Claimant was not asked why her answers to the Panel significantly differed from the answers she allegedly gave Holler.

By July 28, 2014 letter, the Department dismissed Claimant effective July 29, 2014 due to violations of the Code of Ethics, Sections A2, A4, B6 and B10. Specifically, the letter stated:

You admitted to a private arrangement with Inmate Stewart to accept food in exchange for allowing Inmate Smith-Bey to visit his cell. You also admitted that you did favors for inmates by making [photo]copies of photographs from magazines for inmates who used the photographs for tattooing. You further admitted that you made unauthorized [photo]copies of photographs and allowing [sic] non-sanctioned visits for the purpose of sex.

The above violations warrant the level of discipline imposed.

O.R. Item No. 9, July 28, 2014 Dismissal Letter at 1-2.

7

On January 5, 2015, a Referee hearing was held, at which Claimant appeared without legal counsel. Holler and Diehl appeared for the Department. The Department's exhibits, including the Department's suspension letter, the PDC Minutes and termination letter were offered into evidence without objection.

Holler summarized his interviews of several inmates and Claimant. Holler stated that, in addition to the charges that Claimant was having an inappropriate relationship with an inmate, "part of the other allegations were that she was making unauthorized [photo]copies of different reading materials and other materials for inmates including photographs that were being utilized to do tattooing which is against [Department] policy." O.R. Item No. 10, Notes of Testimony (N.T.) at 10. Holler explained, without objection, that although he could not substantiate the allegations pertaining to an inappropriate relationship, he discovered that Claimant had engaged in the other charged misconduct. Specifically, Holler asserted that Claimant

> admitted to receiving food items from inmates that she hid in the ceiling . . . . She admitted to accepting food items such as chips and sandwiches from an inmate by the name of Andre Jose which were being brought in from the kitchen area. She admitted to accepting food items such as chips from an Andre Stewart which he was purchasing at the commerce area. My interview with – she admitted to allowing [I]nmate Stewart and [I]nmate Smith-B[e]y [] that both admitted to being homosexual lovers – [Claimant] stated she was aware of that and she was allowing them to engage – allowing them to be in each other's cells which they were in different parts of the block so that they could engage in homosexual activities. They both admitted that they had conversations with her and Stewart stated he was providing her with food items so that she would allow that to occur. And she admitted she was allowing the visitations.
>
> . . . .

8

She didn't indicate that she thought that there was any harm in those two being friends and alone in the cell.

. . . .

And she denied that she was doing it for them to engage in sexual activity. But they both admitted that she was aware of it through their conversations with her and that, you know, she would give them a wink and a nod.

N.T. at 10. Holler did not address whether Claimant admitted to making the photocopies. Diehl testified similarly, also without objection, summarizing the reason for Claimant's removal.[6]

In response, Claimant explained:

[A] lot of these items they're saying I admitted to[,] I did not admit to what they're saying. If you would read in the minutes of the PDC that was held in June when they asked . . . about . . . allowing the inmates in the cell[,] I explained

_____

[6] Specifically, Diehl stated:

[T]he Claimant[] admitted to a private arrangement with [I]nmate Stewart to accept food in exchange for allowing [I]nmate Smith-B[e]y to visit his cell. She admitted she did favors for inmates by making [photo]copies of photographs or magazines for inmates who use the photographs for tattooing. Tattooing is prohibited. By her own admission she did these things. She received the food, she photocopied pictures to be used for tattooing and she admitted to allowing inmates who she knew were lovers to visit one another in their cells. So if A, she accepted the food from the inmate, B, she knew the inmates were in a relationship as evidenced by her reference to them as lovers, C, she admitted to allowing visits, then it would seem it follows . . . if A, B and C are true[,] it's just common sense to determine that she knew what the purpose of those calming visits were and that that was for the purpose of sex. [Claimant] is not a new employee . . . . [A]s a lead . . . [s]he's a role model. Part of that responsibility is to demonstrate appropriate behavior to other staff and to adhere to [Department] [C]ode of [E]thics which she did not do. Those are the reasons for the termination.

N.T. at 13-14.

9

that on several occasions . . . the [I]nmate Stewart who was a very emotional, highly[-]irritated inmate would get upset on the block, would start crying, doing things like that. And so I would have him go to his cell and then sometimes I would allow the [I]nmate Smith-B[e]y to go down to his cell – all this time there are people out on the floor. The door to the cell remained open and they were never given more than five minutes alone in the cell together. But I would allow [Inmate] Smith-B[e]y to go in and try to calm [I]nmate Stewart down to prevent any kind of more ruckus on the block. As they stated[,] I . . . worked for the Department for 12 years. I had also been the hostage negotiation team leader for probably about five years of that. I was often sent down to places at the Department's request to try to negotiate with inmates to get them to comply with orders. So I looked at it as the same thing. I was working on negotiating with these guys to let [Inmate] Smith-B[e]y speak to [I]nmate Stewart to try to calm him down to prevent any more problems on the block. As for the food, I never agreed or never stated that I made any kind of arrangements to take food. I explained that . . . [I]nmate Stewart at one point in time while I was making [photo]copies dropped a paper bag off on a chair sitting by the copier. When I looked in the paper bag[,] I found a bag of chips and I did not return the chips to [I]nmate Stewart[,] but I also did not eat the chips. They were taken to the bubble and destroyed. About the food in the ceiling, the only food in the ceiling is items that I purchased, coffee, tea, creamer, sugar. And those were kept in the ceiling because it's the only way I could keep them from being stolen and used by officers on the other shift that had not paid or were not supposed to be using them. At no time were there chips that I took from any inmates put in the ceiling. So that is completely untrue. . . . As for the [photo]copies[,] I did make [photo]copies of religious stuff. I made [photo]copies of some of their legal stuff. And I did make [photo]copies of some pictures at sometimes that yes[,] they could've possibly used for tattoos. I did admit to that. But the other items I did not admit to.

N.T. at 14-15. When asked by the Department's representative why Claimant permitted Inmate Stewart and Inmate Smith-Bey to visit together, Claimant explained that she did so because she knew that allowing Inmate Smith-Bey to speak with

10

Inmate Stewart was an effective way to calm Inmate Stewart down when he was agitated. She further reasoned:

> The rules of not allowing inmates in each other's cells are definitely not enforced. I wrote up I don't know how many inmates for being in their cells when there was not a valid reason and nothing was ever done about it. So I figured . . . they didn't seem to care. Then when I was doing it for a constructive reason to try to prevent things from happening on the block just like when they send me down to use as a hostage negotiator in other incidences to get what they wanted taken care of I looked at it as I was doing that same thing on my block. I was keeping calm on the block. That's what I'm supposed to do and that's what was done.

N.T. at 16-17. Finally, Claimant explained:

> I admitted to doing a couple of violations of the rules[,] but I also explained the other ones that I did not violate and being terminated I believe was excessive punishment for the rules that I did violate considering some of the things other people have done there and they all still continue to have their jobs.

N.T. at 19.

On January 15, 2015, the Referee reversed the UC Service Center's determination, finding Claimant ineligible for benefits under Section 402(e) of the Law. Claimant appealed to the UCBR. On April 23, 2015, the UCBR affirmed the Referee's decision. The UCBR upheld the denial of UC benefits based on Claimant's violation of the policy prohibiting employees from performing favors for inmates, but did not address the Department's charge that Claimant permitted the inmates to engage in sexual activity in exchange for food. Claimant appealed to this Court.[7]

---

[7] "Our scope of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether the findings of fact were unsupported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704." *Turgeon v. Unemployment Comp. Bd. of Review*, 64 A.3d 729, 731 n.3 (Pa. Cmwlth. 2013).

11

Initially,

Section 402(e) of the Law provides that an employee is ineligible for unemployment compensation benefits when his unemployment is due to discharge from work for willful misconduct connected to his work. The employer bears the burden of proving willful misconduct in an unemployment compensation case. Willful misconduct has been defined as (1) an act of wanton or willful disregard of the employer's interest; (2) a deliberate violation of the employer's rules; (3) a disregard of standards of behavior which the employer has a right to expect of an employee; or (4) negligence indicating an intentional disregard of the employer's interest or a disregard of the employee's duties and obligations to the employer.

*Dep't of Transp. v. Unemployment Comp. Bd. of Review*, 755 A.2d 744, 747-48 n.4 (Pa. Cmwlth. 2000) (citation omitted).

Claimant first argues that the UCBR's finding that Claimant "admitted to making unauthorized [photo]copies of photographs for the inmates, which she knew might be used for tattooing purposes" is not supported by substantial evidence. O.R. Item No. 17, UCBR Dec. at 2. We disagree.

This Court has explained:

'In unemployment compensation matters, 'the [UCBR] is the ultimate fact finder and is empowered to resolve conflicts in the evidence and to determine the credibility of witnesses.'' *Goppman v. Unemployment Comp. Bd. of Review,* 845 A.2d 946, 947 n.2 (Pa. Cmwlth. 2004) (quoting *Owoc v. Unemployment Comp. Bd. of Review,* 809 A.2d 441, 443 (Pa. Cmwlth. 2002)). 'Findings made by the [UCBR] are conclusive and binding on appeal if the record, examined as a whole, contains substantial evidence to support the findings.' *Umedman v. Unemployment Comp. Bd. of Review,* 52 A.3d 558, 563–64 (Pa. Cmwlth. 2012) (quoting *Owoc,* 809 A.2d at 443). 'Substantial evidence is evidence which a reasonable mind might accept as adequate to support a conclusion.' *Id.* at 564 (quoting *Wheelock Hatchery, Inc. v. Unemployment Comp. Bd. of Review, . . .*

12

648 A.2d 103, 105 n.3 ([Pa. Cmwlth.] 1994)). This Court has held:

> In deciding whether there is substantial evidence to support the [UCBR's] findings, this Court must examine the testimony in the light most favorable to the prevailing party, in this case, the Employer, giving that party the benefit of any inferences which can logically and reasonably be drawn from the evidence.
>
> *Sanders v. Unemployment Comp. Bd. of Review*, 739 A.2d 616, 618 (Pa. Cmwlth. 1999).

*Jacobs v. Unemployment Comp. Bd. of Review*, 129 A.3d 639, 643 (Pa. Cmwlth. 2015). Claimant maintains that "except for the [Referee hearing] transcript of [Claimant's] admission [that she made photocopies out of tattooing magazines so that the inmates could draw], the documents the Department introduced into the record, as evidence in support of the charge of unauthorized photocopying, were entirely uncorroborated hearsay." Claimant's Amended Br. at 13. Claimant argues that "in an unemployment compensation case, uncorroborated hearsay is not competent to support a finding of fact, even in the absence of an objection[.]"[8] *Id*.

Contrary to Claimant's assertion, at least one of the Department's documents was corroborated by Claimant herself. During the Referee hearing, Claimant argued that her PDC statements supported her testimony, and asked the

---

[8] The 'Walker rule' established by *Walker v. Unemployment Compensation Board of Review*, . . . 367 A.2d 366 ([Pa. Cmwlth.] 1976), provides the following guidelines for the use of hearsay evidence in administrative proceedings: '(1) Hearsay evidence, [p]roperly objected to, is not competent evidence to support a finding of the Board . . . (2) Hearsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of the [UCBR], [i]f it is corroborated by any competent evidence in the record, but a finding of fact based [s]olely on hearsay will not stand.' *Id*. at 370 (internal citations [and italics] omitted.) *Reed v. Workers' Comp. Appeal Bd. (Allied Signal, Inc.)*, 114 A.3d 464, 470 n.5 (Pa. Cmwlth. 2015).

13

Referee to read Claimant's explanations contained "in the minutes of the PDC that was held in June[.]" O.R. Item No. 10, N.T. at 14. According to the PDC Minutes, Claimant admitted that she had received and signed for the Code of Ethics, and that she was not compliant with the Code of Ethics, Section A4, which provides in relevant part, "Correctional employees shall not accept or perform favors or accept or distribute any gifts, money, or loans to or from inmates or members of an inmate's family." O.R. Item No. 9, Department's July 28, 2014 Letter at 1. She also admitted therein that she "made [photo]copies [out of] tattoo magazines so [the inmates] could draw. It was not a wise decision[,] but I did it." O.R. Item No. 9, PDC Minutes at 6. Claimant, therefore, sought to rely at the Referee hearing on the very same "uncorroborated hearsay" that she now challenges. Her reliance thereon corroborated the hearsay and thus, at the very least, Claimant's admissions in the PDC Minutes constitute competent evidence. Accordingly, there is substantial evidence that Claimant knowingly violated the Department's rule prohibiting the performance of favors for inmates, and that she made photocopies so that the inmates could draw.

Claimant next contends that there is no evidence demonstrating that Claimant knew at the time she made the photocopies that they might be used for tattooing purposes and, thus, her work rule violation was not willful misconduct, but merely negligence. We disagree. The UCBR found that Claimant "admitted to making unauthorized [photo]copies of photographs for the inmates, **which she knew might be used for tattooing purposes**[,]" and that Claimant was discharged for "performing favors to inmates." O.R. Item No. 17, UCBR Dec. at 2 (emphasis added). Claimant is correct that although Claimant admitted at the UC hearing that the photocopies could have been used for tattooing purposes, she did not admit during

14

her testimony that she knew **at the time she made the photocopies** that they could be used for tattooing.[9]

Nonetheless, Claimant's intentional conduct was photocopying the photographs, without authorization, for the inmates' benefit. Whether Claimant made the photocopies "out of tattoo magazines" knowing that they were for tattooing purposes, or as Claimant reasoned, "so [the inmates] could draw[,]" Claimant made the photocopies. O.R. Item No. 9, PDC Minutes at 6. Claimant's conduct in photocopying the tattoo magazine photos – even if they were to be used for drawing purposes – constituted favors for inmates.[10] The intentional performance of prohibited **favors** for inmates constituted a violation of the Code of Ethics, Section A4. Thus, there is substantial evidence to support the UCBR's finding that Claimant "admitted to making unauthorized [photo]copies of photographs for the inmates," which violated the Department's Code of Ethics prohibiting employees from providing favors to inmates.

Claimant next argues that the Department failed to meet its burden of proving the elements of a work rule violation. We disagree.

> When an employee is discharged for violating a work rule, the employer must prove the existence of the work rule, the reasonableness of the rule, the claimant's awareness of the rule, and the fact of its violation. The burden then shifts to the employee to prove that he or she had good cause for

---

[9] However, the PDC fact-finding revealed that, during Holler's interview, "[Claimant] confirmed that she made unauthorized [photo]copies, utilizing the photocopier in the counselor's office, of photographs from magazines. [Claimant] admitted she knew the photographs were used for tattooing purposes." O.R. Item No. 9, PDC Minutes at 3. Claimant contradicted Holler's representation: "I made [photo]copies [out of] tattoo magazines **so they could draw**. It was not a wise decision but I did it." O.R. Item No. 9, PDC Minutes at 6 (emphasis added).

[10] Claimant's knowledge of the inmates intended use for the photocopies is not relevant to our inquiry regarding whether Claimant performed prohibited favors for inmates, since, regardless of whether she knew at the time that she made the photocopies that they could be used for tattooing purposes, the unauthorized copying itself constituted a prohibited favor.

> violating the rule. An employee establishes good cause by showing that his or her conduct was justified or reasonable under the circumstances.

*Adams v. Unemployment Comp. Bd. of Review*, 56 A.3d 76, 79 (Pa. Cmwlth. 2012) (citations omitted).

With respect to the first element, the Department offered into evidence, without objection, its July 28, 2014 dismissal letter which quoted the applicable Code of Ethics sections. Further, both of the Department's witnesses explained that Claimant's conduct was prohibited and violated the Department's Code of Ethics. Finally, Claimant admitted during the PDC that she was not compliant with the Code of Ethics, Section A4. Accordingly, the Department sufficiently established the work rule's existence.

In regards to the second element, our Supreme Court has held: "To be reasonable, the policy and its application under the circumstances presented must be 'appropriate to pursue a legitimate interest.'" *Chambersburg Hosp. v. Unemployment Comp. Bd. of Review*, 41 A.3d 896, 900 (Pa. Cmwlth. 2012) (quoting *Caterpillar, Inc. v. Unemployment Comp. Bd. of Review*, 703 A.2d 452, 457 (Pa. 1997)). Preventing fraternization and favors between inmates and Department employees serves a legitimate interest of ensuring the proper operation of Department facilities and prevents potential undue or improper inmate influence over Department employees.[11]

Concerning the third element - Claimant's knowledge of the applicable work rule – the Department's witness, Holler, testified that "[Claimant] was the sergeant [and] knew what the policy was regarding such issues. She received the proper training[.]" N.T. at 11. Holler's conclusion is further supported by Claimant's admissions. The PDC Minutes show that Claimant admitted receiving

---

[11] "Prison officials are given a wide range of discretion in the promulgation and enforcement of rules to govern the prison community in order to maintain security, order and discipline." *Dep't of Public Welfare, Farview State Hosp. v. Kallinger*, 580 A.2d 887, 890 (Pa. Cmwlth. 1990).

and signing for a copy of the Department's Code of Ethics.[12]   Accordingly, the Department established that Claimant was on notice of the Department's work rules. *See Schroeder v. Unemployment Comp. Bd. of Review*, 846 A.2d 790 (Pa. Cmwlth. 2004).

With respect to the fourth element, Claimant argues that the Department did not demonstrate that Claimant violated the work rule prohibiting Department employees from providing favors to inmates since the rule does not specifically describe prohibited conduct.  Claimant contends that the term "favor" as used in the rule is vague, and a strict interpretation would unreasonably prohibit "all acts of kindness and helpfulness."  Claimant's Amended Br. at 19.  We disagree.

In support of her position, Claimant cites the American Heritage Dictionary's definition of "favor" as "an act of kindness."[13]  Claimant's Amended Br. at 19.  She also quotes the *Oxford American Dictionary* (1980) definition of "favor" as "an act that is kindly or helpful *beyond what is due or usual*[.]"  Claimant's Amended Br. at 19.  Claimant asserts that the prohibited conduct is not clearly delineated, and asks "[w]hat kindness or helpfulness is due or usual?"  *Id.*

Based on this latter definition, it is clear that all acts of kindness are not favors and those "kindly or helpful" acts that are "due or usual" are not favors.  *Id.* Claimant's job duties (those tasks Claimant was required to perform for her position)

---

[12] Claimant asserts that her admission at the PDC that she received and signed for the Code of Ethics does not prove that she had done so prior to the violation, and thus, there is no proof that she was aware of them at the time of the violations.  However, Claimant pronounces in her brief and cites to the record evidence of her testimony and Diehl's testimony as well as documentation that she had twelve years of service with the Department, eight years of which she served as a special team leader and attained the rank of sergeant.  Claimant's Amended Br. at 22.  Moreover, Holler's uncontroverted testimony that Claimant knew the policy at the time of the violations based on her years of experience and the training she received is substantial evidence from which the UCBR could conclude that Claimant was aware of the policy at the relevant time.

[13] Notably, *The American Heritage Dictionary of the English Language* 479 (1980) also defines "favor" as "[a]n act requiring sacrifice or **special generosity**[,]" and "**[p]artiality; favoritism.**"  (Emphasis added.)

17

were Claimant's "due [and] usual" activities, even if those duties involved kindness or helpfulness in assisting inmates. *Id*. Thus, acts that fall within Claimant's job duties are acts that are "due [and] usual." *Id*. When Claimant engaged in unauthorized activities **beyond** the duties of her position to benefit the inmates, she performed prohibited favors. Thus, we conclude that the Department established Claimant's violation of its work rule. The burden then shifted to Claimant to establish that she had good cause for violating the rule. Claimant presented no such evidence; therefore, the Department met its burden.

Next, Claimant asserts the UCBR's determination that Claimant's photocopying for inmates was the actual cause for her dismissal is not supported by substantial evidence. Claimant argues that she was charged with both permitting inmates to engage in sex in exchange for food, and for providing favors in the form of unauthorized photocopies. Therefore, Claimant contends that "[t]he Department . . . asserted that it was the *combination* of the alleged violations that warranted [Claimant's] dismissal[,]" and accordingly, the Department was required to show that Claimant's employment would have been terminated solely for her conduct related to the photocopying. Claimant's Amended Br. at 21. We disagree.

In *Anderson v. Unemployment Compensation Board of Review*, 485 A.2d 900 (Pa. Cmwlth. 1985), this Court held that where an employee's employment is terminated for multiple reasons, the employee will be ineligible for UC benefits if even one of those reasons amounts to willful misconduct. Here, because the Department established that Claimant's unauthorized photocopying for the inmates constituted willful misconduct, Claimant's argument fails.

Finally, Claimant argues that the UCBR erred when it denied Claimant UC benefits for the 76 days of her suspension based, not on the reason for her suspension, but on a reason for her subsequent dismissal. We disagree.

18

Claimant's suspension from May 15, 2014 through July 29, 2014, as stated in the Department's May 27, 2014 letter, was explained at the Department's May 14, 2014 meeting. *See* O.R. Item No. 3, Suspension Pending. Claimant was suspended one day after a "Suspension Pending" meeting, during which multiple charges (including the unauthorized photocopying charge) were presented against Claimant and at which time Claimant declined to respond to the charges. Thus, Claimant was made aware of the charges the day before her suspension and provided an opportunity to respond. Although the May 27, 2014 letter explained that "[t]his suspension is pending completion of [the Department's] investigation into charges of an unauthorized relationship between yourself and an inmate[,]" the letter also communicated that it is to "confirm verbal notification" of the suspension and, stated that "[d]ue to the charges filed against you, your removal from the work place is warranted pending further investigation." O.R. Item No. 3, May 27, 2014 Revised Letter. Thus, Claimant's suspension was not simply based on the unauthorized relationship, but on all of the charges presented at the meeting the day before the suspension became effective. Accordingly, Claimant's argument is without merit.

For all of the above reasons, the UCBR's order is affirmed.

_____
ANNE E. COVEY, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Debra D. Witherell,          :
          Petitioner        :
                             :
          v.                :
                             :
Unemployment Compensation   :
Board of Review,         :     No. 808 C.D. 2015
          Respondent    :

## O R D E R

AND NOW, this 12th day of May, 2016, the Unemployment Compensation Board of Review's April 23, 2015 order is affirmed.

 

                                _____

                                ANNE E. COVEY, Judge